**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-232(CJN)** |
| **v.** | : | |
| | : | |
| **CHAD HEATHCOTE,** | : | |
| | : | |
| **Defendant** | : | |

# GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Chad Heathcote to 30 days' incarceration, 36 months' probation, and $500 in restitution.

## I. Introduction

Defendant Chad Heathcote, a 42-year-old programmer from Adel, Iowa, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

[1] Although the Statement of Offense in this matter, filed on November 4, 2022, reflects a sum of more than $1.4 million dollars for repairs (ECF No. 25 at ¶ 6), as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Heathcote pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration as well as probation is appropriate in this case because Heathcote violated police officer instructions directed at him on two separate occasions and endangered police when breaching the Capitol. He later boasted about that conduct and has yet to express any remorse for the crime he committed on January 6.

At approximately 3:10 pm on January 6, 2021, Heathcote entered the Capitol at the Brumidi Corridor despite being told not to do so by police guarding the door. Approximately 20 to 30 other rioters followed Heathcote after he pushed his way inside the Capitol. Heathcote then refused another police officer's command to exit the building, which likely impacted the decisions of the other rioters to refuse to yield as well. A phalanx of police officers then had to forcibly remove Heathcote and the rioters that had followed him—thereby creating a dangerous situation that could easily have escalated and led to serious harm.

The Court must also consider that Heathcote's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and to disrupt the proceedings. Here, the facts and circumstances of Heathcote's crime support a sentence in this case of 30 days' incarceration, 36 months' probation, and $500 in restitution.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 25 (Statement of Offense), at ¶¶ 1-7.

*Defendant Heathcote's Role in the January 6, 2021 Attack on the Capitol*

Heathcote traveled from Iowa to Washington, D.C. to protest Congress's certification of the Electoral College vote and to attend the "Stop the Steal Rally." Statement of Offense, ¶¶ 8-9. Following the rally, Heathcote (wearing blue jeans and a gray jacket) marched with others to the Capitol, where he stood in a restricted area and observed, among other things, police officers in gas masks and riot gear, *id.,* as shown in Image 1 below.



*Image 1*

Heathcote then moved to the Northeast side of the Capitol, where two police officers in riot gear were standing at an exterior door leading to an area known as the Brumidi Corridor while an enormous crowd was gathered outside. By this time, the Capitol Building had already been breached on both the West Side and the East Side. Police officers were struggling to control the rioters inside the building while also staving off additional rioters trying to breach the building.

Heathcote charged toward the Brumidi Corridor entrance at a time when other rioters were behind a security barricade and not confronting the officers, as shown in Images 2 and 3 below:



*Image 2*



*Image 3*

Heathcote and the rioter in the blue jacket and red hat briefly stopped in front of the door but refused to heed the officers' instructions that they stay outside, as shown in Image 4:



*Image 4*

Moments later, at approximately 3:10 p.m., the door was opened from the inside by rioters leaving the building. The rioter in the blue jacket pulled open the door and Heathcote breached the Capitol. Dozens of rioters immediately followed him (as shown in Image 5) as the two officers guarding the door were greatly outnumbered (as shown by the advancing crowd in Image 6):



*Image 5 (Heathcote inside the door and not pictured)*



*Image 6 (rioters advancing to the door)*

A Capitol Police Officer inside the corridor immediately responded to the breach by approaching Heathcote with his hands out in front of him, signaling that Heathcote should turn around, as shown in Image 7:



*Image 7*

Heathcote, however, refused to budge. Instead, he planted himself in front of the officer and took out his cell phone, apparently to record the confrontation that would ensue:



*Image 8*

Rioters who had streamed into the Brumidi Corridor behind Heathcote similarly opposed the commands to leave. A group of officers then had to forcibly push the rioters, including Heathcote, out of the door:



*Image 9*

Police officers forcibly removed Heathcote from the Capitol at approximately 3:12 p.m.[2] Heathcote fell to the ground upon being pushed out of the building and left the immediate vicinity, while remaining on Capitol grounds. The disturbance at the Northeast door—which had been instigated in significant part by Heathcote's determination to breach the door, and the impact it had on the rioters who followed Heathcote into the building—quickly turned chaotic. Rioters fought with police officers and threw hard objects at them, including a chair. [3]

Shortly thereafter, at 3:35 pm, Heathcote boasted to a friend by text message about the storming of the Capitol. He wrote, "We own the Capital [sic]."

---

[2] A clip of the closed-circuit television surveillance video captioning this incident from inside the Capitol Building has been submitted directly to the Court and defense counsel via USAfx as Exhibit A. The CCTV video does not have audio.

[3] A clip of a publicly available video captioning this incident from outside the Capitol Building has been submitted directly to the Court and defense counsel via USAfx as Exhibit B. This video does not capture Heathcote's approach to the door; it begins with him already at the door.

That evening Heathcote sent another message to a friend, seemingly taunting Congress, "Wonder if they got the message?"[4]

*The Charges and Plea Agreement*

On May 3, 2022, the United States charged Heathcote by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On May 4, 2022, law enforcement officers arrested him at his home in Iowa. On July 1, 2022, the United States charged Heathcote by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 4, 2022, pursuant to a plea agreement, Heathcote pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Heathcote agreed to pay $500 in restitution to the Architect of the Capitol.

## III. Statutory Penalties

Heathcote now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Heathcote faces up to six months of imprisonment and a fine of up to $5,000. Heathcote must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the

---

4 These messages were produced to the defense in discovery as part of a cell phone extraction report, which was created by the Government following the search and seizure of the defendant's phone pursuant to a search warrant.

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration, 36 months' probation, and $500 in restitution.

**A. The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Heathcote's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Heathcote, the absence of violent or destructive acts is not a mitigating factor. Had Heathcote engaged in such conduct, he or she would have faced additional criminal charges.

The most important factor in Heathcote's case is his choice, at a time when the riot of the Capitol was in full swing, to initiate an additional breach of the Capitol by ignoring armed guards and entering the Brumidi Corridor. Before Heathcote breached the Capitol, he had been on the West Terrace and seen police in riot gear trying to control the scene. It is almost unfathomable that, while there, he did not also observe police officers using pepper spray, flash bangs, and other

less-than-lethal methods to try to disperse the crowd, while rioters in the crowd assaulted police officers and damaged property.

Nevertheless, at 3:10 pm, when Heathcote saw a door on the Northeast side of the Capitol Building that was not currently breached and which was being guarded by armed officers, he barreled toward the door and ignored the officers' request not to go inside. By his actions, Heathcote encouraged other rioters who had been keeping a distance from the door to rush forward as well. Within minutes, dozens of rioters that had been outside the building moments earlier came inside, compounding the difficulties for officers trying to secure the building and, even more importantly, the people sheltering inside it.

Once inside the building, Heathcote made a second dangerous choice: he ignored the signs from the first Capitol Police officer who approached him that he should turn back. Heathcote thus gave further impetus to the group that followed behind him to resist police officers as well. Heathcote's willful non-compliance, and that of his fellow rioters, gave police officers no choice other than to forcefully push the group back through the door and outside the building. The physical confrontation between officers and rioters, triggered in significant part by Heathcote, quickly turned chaotic, with rioters even throwing a chair at officers. The government fortunately has not identified any particular injury or damage caused in this incident. The dangerousness of the events caused in significant part by Heathcote, however, is integral to any assessment of the nature and circumstances of Heathcote's offense.

Accordingly, the nature and the circumstances of this offense establish the clear need for a split sentence of incarceration and probation in this matter.

### B. The History and Characteristics of Heathcote

Heathcote does not have any known criminal history. PSR ¶¶ 20-21. The Government is not aware of Heathcote publicly promoting violence or misconduct, or publicly exalting the illegal actions on January 6 after the fact. Heathcote has also been complaint with pre-trial supervision. ECF 20.

As set forth in the PSR, Heathcote reported that he served in the Army National Guard from December 1998 to December 2001, and the United States Navy from December 2001 to May 2007, following which he was honorably discharged. PSR ¶ 43. While Heathcote's military service would otherwise be laudable, it renders his conduct on January 6 all the more troubling. From his former military service and training, Heathcote should have known the danger that the violent mob posed to police officers protecting the Capitol and to Congresspersons and staff working inside the Capitol. Heathcote, however, chose to ignore all the signs of danger posed by the mob when storming into the Capitol on January 6.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. The gravity of these offenses thus demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future

potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Heathcote declined to speak with the FBI when approached for a voluntary interview. He also declined to make any statement during the presentence interview beyond acknowledging the conduct described in the Statement of Offense. PSR ¶ 17. Thus, Heathcote has not expressed any remorse to date for his conduct on January 6. A sentence of imprisonment followed by probation is warranted to further the sentencing goal of specifically deterring Heathcote from participating, should the opportunity arise, in any future illegal and dangerous riot.

**E. The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Heathcote based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Heathcote has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, and Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. *See* Exhibit C. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. However, the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in

the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See, e.g., United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who, like Heathcote, took willful, aggressive actions to enter the Capitol and thereby furthered the ongoing riot, but who also did not engage in other aggravating conduct on January 6 or thereafter, have no criminal history, and have been compliant with their release conditions.

In *United States v. Bradley Rukstales* (1-21-CR-041)(CJN), Rukstales similarly refused police commands to leave the Capitol and, in doing so, exacerbated a dangerous situation: he threw a chair in the direction of officers who had been forced to hastily retreat from encroaching rioters in the Capitol Visitor Center, and after a melee broke out between police and rioters, he refused to

leave until he was dragged out by two police officers behind a police line. Rukstales, unlike Heathcote, expressed some remorse for his conduct. The Government recommended 45 days of incarceration and the Court sentenced Rukstales to 30 days of incarceration.

In *United States v. Suzanne Ianni* (1-21-CR-451)(CJN), Ianni led rioters in chants while seeing rioters breaking doors and windows to gain access to the Capitol; she was part of a group that confronted and eventually overwhelmed police officers inside the Capitol, allowing the group to move further into the Capitol; and she did not express remorse for her actions on January 6. The Government recommended 30 days of incarceration and 36 months of probation, and the Court sentenced Ianni to 15 days of incarceration and 30 months of probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). [6]

---

[6] This Court and numerous other judges in this district have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have

## IV. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' incarceration, 36 months' probation, and $500 in restitution. Such a sentence would protect the community, promote respect for the law, and deter future crime by imposing restrictions on Defendant's his

---

imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATHEW GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By: /s/

JASON M. MANNING
Trial Attorney, Detailee
NY Bar No.: 4578068
1400 New York Avenue NW
Washington, D.C. 20005
Jason.Manning@usdoj.gov
(202) 514-6256

**CERTIFICATE OF SERVICE**

On this 3rd day of February 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ *Jason Manning*
Trial Attorney, Detailee